CENTER FOR DISABILITY ACCESS
Ray Ballister, Jr., Esq., SBN 111282
Phyl Grace, Esq., SBN 171771
Chris Carson, Esq., SBN 280048
Mail: PO Box 262490
San Diego, CA 92196-2490
Delivery: 9845 Erma Road, Suite 300
San Diego, CA 92131
(858) 375-7385; (888) 422-5191 fax
phylg@potterhandy.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Shonna Counter,** | **Case No**. 2:18-cv-10290-GW-AGR |
| Plaintiff, | **Plaintiff's Opposition to Defendants' Motion to Dismiss First Amended Complaint** |
| v. | |
| **Enterprise Rent-A-Car Company of Los Angeles, LLC,** a Delaware Limited Liability Company; and Does 1-10, | Date:    June 27, 2019<br>Time:    8:30 a.m. |
| Defendants. | **Hon. George H. Wu** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ i

MEMORANDUM OF POINTS AND AUTHORITIES ......................... 1

   I.    PRELIMINARY STATEMENT ................................................. 1

   II.   RELEVANT FACTS .................................................................. 2

   III.  OBJECTIONS TO DECLARATIONS ...................................... 7

   IV.  DEFENDANT'S JURISDICTIONAL CHALLENGE IS
        INAPPROPRIATE AS A 12(B)(1) MOTION ......................... 7

   V.   PLAINTIFF'S FIRST AMENDED COMPLAINT
        ADEQUATELY PLEADS HER PRIMA FACIE CASE ...... 10

   A.   Counter is a profoundly disabled person and an active
        ADA litigator who personally encountered a blatant
        parking policy violation at Enterprise Rent-A-Car and
        who has declared that she intends to return to the
        Enterprise but is deterred from returning until it is fully
        compliant. There can be no doubt that Counter has met
        the broad and liberal test for standing in ADA cases............. 10

   B.   Counter suffered an injury in fact because she personally
        encountered the unlawful parking policy condition at the
        Enterprise numerous times in 2018. ....................................... 11

   C.   Counter has standing to obtain injunctive relief because
        she is deterred from returning to the Enterprise Rent-A-
        Car until the unlawful barriers are removed. ......................... 14

   VI.  THE DEFENSE HAS NOT MET THE "FORMIDABLE"
        BURDEN OF ESTABLISHING MOOTNESS ..................... 18

   VII. THERE IS NO BASIS FOR THE COURT TO DECLINE
        SUPPLEMENTAL JURISDICTION OVER THE
        UNRUH CLAIM .................................................................. 22

1

VIII. CONCLUSION .......................................................................... 25

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Baker v. Palo Alto University, Inc.*, 2014 WL 631452, *2 (N.D. Cal.,

4

2014). .................................................................. 24

5

*Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 787 (3d Cir. 1995)... 25

6

*Careau Grp. v. United Farm Workers of Am., AFL-CIO*,

7

940 F.2d 1291 (9th Cir. 1991) ............................................ 10

8

*City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 173 (1997 23

9

*City of Mesquite v. Aladdin's Castle, Inc.*,

10

455 U.S. 283 (1982).................................................. 19

11

City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1982 .......... 14

12

*Civ. Rights Educ. and Enf't Ctr. v. Hosp. Properties Tr.*,

13

867 F.3d 1093 (9th Cir. 2017) ...................................... 16

14

*Civ. Rights Educ. and Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093

15

(9th Cir. 2017).................................................... 17

16

*Daenzer v. Wayland Ford, Inc.*, 193 F. Supp. 2d 1030, 1043 (W.D.

17

Mich. 2002) ...................................................... 25

18

*Delgado v. Orchard Supply Hardware Corp.*,

19

826 F. Supp.2d 1208 (E.D. Cal. 2011).......................... 24

20

*Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) ................. 11, 16

21

*Executive Software N. Am., Inc. v. U.S. Dist. Court for the N. Dist. of*

22

*Cal.*, 24 F.3d 1545, 1555-56 (9th Cir. 1994) ..................... 23

23

Feldman v. Pro Football, Inc.,

24

419 F. App'x 381 (4th Cir. 2011)................................. 21, 22

25

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*.,........... 14

26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

27

528 U.S. 167 (2000)................................................ 1, 19

28

*Grove v. De La Cruz,*
  407 F. Supp. 2d 1126 (C.D. Cal. 2005) ............................................... 21

*Houston v. Marod Supermarkets, Inc.,* 733 F.3d 1323 (11th Cir. 2013) 18

*Iron Arrow Honor Soc'y v. Heckler,*
  464 U.S. 67 (1983) ............................................................................. 21

*Jenkins v. United States Gas Corporation,*
  400 F.2d 28 (5th Cir. 1998)................................................................. 21

*Kalani v. Castle Village LLC,*
  14 F.Supp.3d 1359 (E.D. Cal. 2014).................................................... 20

*Kohler v. CJP, Ltd.,*
  818 F. Supp. 2d 1169 (C.D. Cal. 2011) ................................................ 8

*Kuba v. 1-A Agr. Ass'n,*
  387 F.3d 850 (9th Cir. 2004)............................................................... 23

*Nat'l Adver. Co. v. City of Miami,*
  402 F.3d 1329 (11th Cir.2005) ........................................................... 21

*Natl. Fedn. of the Blind of California v. Uber Techs., Inc.,* 103 F. Supp.
  3d 1073 (N.D. Cal. 2015) (emphasis added). ..................................... 11

*Pickern v. Holiday Quality Foods Inc.,* 293 F.3d 1133 (9th Cir. 2002). 17

*Roberts v. Corrothers,*
  812 F.2d 1173 (9th Cir. 1987) ............................................................. 1

*Rosado v. Wyman,* 397 U.S. 397, 405 (1970.......................................... 25

*Rosales v. United States,*
  824 F.2d 799 (9th Cir. 1987)............................................................... 10

*Safe Air for Everyone v. Meyer,*
  373 F.3d 1035 (9th Cir. 2004) ............................................................. 9

*Santiago v. Miles,*
  774 F.Supp. 775 (W.D.N.Y. 1991) ...................................................... 20

*Schneider v. TRW, Inc.,* 938 F.2d 986, 993 (9th Cir. 1991)................... 25

iv

*Sharp v. Rosa Mexicano, D.C., LLC,*
    496 F. Supp. 2d 93 (D.D.C. 2007) .................................................................. 20

*Sheely v. MRI Radiology Network, P.A.,*
    505 F.3d 1173 (11th Cir. 2007) ........................................................... 21

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................. 21

*Sun Valley Gasoline, Inc. v. Ernst Enter., Inc.,*
    711 F.2d 138 (9th Cir. 1983) .................................................. 8, 9, 10

*Tandy v. City of Wichita,*
    380 F.3d 1277 (10th Cir. 2004) ........................................................... 19

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972) ....................... 11

*United Mine Workers of Am. v. Gibbs,*
    383 U.S. 715 (1966) ........................................................................... 23

*United States v. Concentrated Phosphate Export Ass'n,*
    393 U.S. 199 (1968) ........................................................................... 19

*United States v. W.T. Grant,*
    345 U.S. 629 (1953) ........................................................................... 20

*Wilson v. Pier 1 Imports (US), Inc.,* 413 F. Supp. 2d 1130, 1133 (E.D.
    Cal. 2006) ........................................................................................... 11

**Statutes**

28 U.S.C. § 1367 ...................................................................................... 22

28 U.S.C. § 1367(c ................................................................................... 23

42 U.S.C. § 12182(b) ............................................................................... 12

Cal. Civ. Code § 51(f). ............................................................................ 23

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

Enterprise Rent-A-Car Company of Los Angeles, LLC moves for dismissal of Counter's ADA cause of action on the basis that Counter lacks standing and that the court should decline to exercise supplemental jurisdiction over Counter's Unruh claim.  Neither of these arguments have merit. Counter has standing and there is no basis for the court to decline supplemental jurisdiction over the Unruh claim.  This court should deny the defense motion.

A court should not resolve disputed facts where the question of jurisdiction is dependent on the resolution of factual issues going to the merits.  *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Here, the First Amended Complaint's primary claim is that the Defendant's employees park rental inventory in the designated accessible parking spaces on a regular and consistent basis. The defense motion challenging jurisdiction asks the Court to determine whether the defendant's employees park rental inventory in the designated accessible parking spaces on a regular and consistent basis. In such cases, the Rule 56 "summary judgment standard" applies and this current motion is premature until the plaintiff has had the opportunity to conduct discovery. *Roberts*, 812 F.2d at 1177.

A case only becomes moot, "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). In the present case, the violation - improper use of a designated spot – is of the type that constantly recurs, and in fact can recur at any moment. The defendant's employees have a

1

1   history of intentionally and aggressively violating the ADA parking
2   requirements, and the Accessible Parking Spaces Best Practices forms
3   defendant submitted as evidence – which employees alleged signed but
4   are in fact impermissible hearsay – do not include any evidence of any
5   repercussions should these "best practices" be ignored again.

6   The fact is without a Court Order, there is nothing keeping Defendants
7   from reverting to old behaviors, and no repercussions if they do.

8   Finally, Defendant spends a great deal of time and efforts arguing that
9   it has no record of Ms. Counter having made a reservation. This line of
10  argument is both misleading and irrelevant.

11
12  ## II.   RELEVANT FACTS

13  Shonna Counter suffers from spinal muscular atrophy.  She
14  primarily uses a wheelchair for mobility. (Decl. of Counter, ¶ 2).  Ms.
15  Counter has a Disabled Person Parking Placard issued to her by the
16  California Department of Motor Vehicles. She needs an access aisle to
17  transfer out of my wheelchair and into a vehicle. (Decl. of Counter, ¶ 3).
18  Due to experiences that Ms. Counter have previously suffered, she
19  attempts to avoid parking in non-marked, non-reserved, non-accessible
20  parking spaces. (Decl. of Counter, ¶ 4).

21  In February 2018, Ms. Counter's vehicle was totaled in a car
22  accident.  (Decl. of Counter, ¶ 5).  After her vehicle was totaled, Ms.
23  Counter often relied on public transportation to get around, when she
24  wanted to attend activities or events more than approximately 20 miles
25  away, or with a specific start time; she relied on a driver and rental vehicles
26  for transportation.  (Decl. of Counter, ¶ 6).

27  Ms. Counter is always the passenger in any vehicle, whether her
28  own or a rental vehicle, and she needs a vehicle entrance of a certain height

2

1    and width to allow her to transfer from her manual wheelchair to the

2    vehicle more easily. (Decl. of Counter, ¶ 7).

3        In 2018, the Enterprise located at 1435 S. La Cienega, Los Angeles,

4    California, was close enough to Ms. Counter's home that she could travel

5    there alone in her power wheelchair. (Decl. of Counter, ¶ 8).  During 2018,

6    Ms. Counter went to the Enterprise at least a dozen times.  She needed to

7    rent a car to travel to several events and locations she could not easily get

8    to using public transit. She also passed by Enterprise frequently on her

9    daily errands around her neighborhood. (Decl. of Counter, ¶ 9).

10       Due to Enterprise's practice of parking rental cars in the access

11   aisle, Ms. Counter frequently could not enter the store to conduct

12   transactions. As a result, Mr. Garry Kann, her approved In-Home

13   Supportive Services provider, rented vehicles from another location at her

14   request several times in 2018.  (Decl. of Counter, ¶ 10)

15       Mr. Kann drives Ms. Counter to her personal appointments and

16   activities. (Decl. of Counter, ¶ 11).  On February 24 to 26, 2018, March 3

17   to 5, 2018, March 23 to 26, 2018, August 7 to 8, 2018, and January 9 to

18   10, 2019, Mr. Kann rented a vehicle with the specific purpose of

19   transporting Ms. Counter to her personal appointments and activities at

20   her request. Mr. Kann worked with Enterprise personnel to reserve a

21   vehicle that meets Ms. Counter's physical needs. He drove Ms. Counter

22   to her appointments and activities, and thus was the primary and sole

23   driver. Mr. Kann was also the holder of the credit card used to pay for the

24   reservation because he was informed by Enterprise personnel that was a

25   requirement. (Decl. of Kann, ¶¶ 1-7). Ms. Counter reimbursed Mr. Kann

26   for the expense informally through such things as buying his meals and

27   cash. (Decl. of Counter, ¶ 12).

28       In February 2018, Ms. Counter needed a car for the purpose of

3

1   transporting her to a cat show and adoption event in Pasadena, and thus,
2   she asked her care provider, Mr. Garry Kann, to rent a vehicle for her on
3   February 24 to 26, 2018. (Decl. of Counter, ¶ 13)

4        In March 2018, Ms. Counter needed a car for the purpose of
5   transporting her to a dog show in Pomona Fair Grounds, and thus, she
6   asked her care provider, Mr. Garry Kann, to rent a vehicle for her on
7   March 3 to 5, 2018. (Decl. of Counter, ¶ 14).

8        Later in March 2018, Ms. Counter needed a car for the purpose of
9   transporting her to a Schutzhund Working Dog Competition and thus, she
10  asked her care provider, Mr. Garry Kann, to rent a vehicle for her on
11  March 23 to 26, 2018. (Decl. of Counter, ¶ 15).

12       In August 2018, Ms. Counter needed a car for the purpose of
13  transporting her to attend a birthday celebration at a Beverly Hills
14  restaurant, and thus, she asked her care provider, Mr. Garry Kann, to rent
15  a vehicle for her on August 7 to 8, 2018. (Decl. of Counter, ¶ 16).

16       In January 2019, Ms. Counter needed a car for the purpose of
17  transporting her to a foster/adoption event, and thus, she asked her care
18  provider, Mr. Garry Kann, to rent a vehicle for her on January 9 to 10,
19  2019. (Decl. of Counter, ¶ 17).

20       Ms. Counter complained, on a number of occasions, to employees
21  of the Enterprise about their practice of parking rental stock in the
22  designated accessible spot. (Decl. of Counter, ¶ 19). In August 2018,
23  during one of her visit, Ms. Counter complained to an employee out in the
24  parking lot that the parking spaces were being used by Enterprise to store
25  rental inventory. The employee said that he could move the vehicles out
26  of the parking spaces if she needed to use them. She told the employee
27  that the parking spaces were supposed to be available when she arrives,
28  not upon request after she have already arrived. When Ms. Counter asked

4

for the employee's name, the employee refused to give her his name. (Decl. of Counter, ¶ 20).

After Ms. Counter managed to squeeze by the rental cars parked in the parking spaces and access aisle reserved for persons with disabilities, she went inside the Enterprise to get a manager, so that she could discuss the parking situation, and to get the name of the employee who would not provide his name outside in the parking lot. (Decl. of Counter, ¶ 21). The employee who would not provide his name opened the door and urged his fellow employees to not provide his name to Ms. Counter. Not only did the employees inside refuse to give up their co-worker's name, none of the employees inside would get a manager. Instead, the indoor staff informed Ms. Counter she had to leave the premises and threatened to call the police. (Decl. of Counter, ¶ 22).

Ms. Counter called customer service using the toll-free number and explained the situation to a customer-service representative. After listening to her concerns and experience, the customer-service representative assured her that a district manager from Enterprise would call her back. No district manager ever called Ms. Counter back. (Decl. of Counter, ¶ 23).

Subsequently, Ms. Counter became aware of Defendant's claim to have implemented policies and procedures prohibiting employees from parking vehicles in the spaces reserved for persons with disabilities. (Decl. of Counter, ¶ 24). On March 13, 2019, Ms. Counter returned to Enterprise to see for herself whether they were still parking vehicles in spaces reserved for persons with disabilities. Mr. Kann drove her. (Decl. of Counter, ¶ 25).  Despite Defendant's claim, she saw a vehicle parked across the stall and access aisle of a space reserved for persons with disabilities. (Decl. of Counter, ¶ 26).  Because of the condition of the

1   parking, Mr. Kann took a photograph of the vehicle parked across the
2   parking space reserved for persons with disabilities to provide to her
3   attorneys while she remained in the vehicle.  (Decl. of Counter, ¶ 27).

4        One of Defendant's employees saw Mr. Kann taking a photograph.
5   The employee approached Ms. Counter and then screamed in an
6   antagonizing and threatening manner at her. (Decl. of Counter, ¶ 28).
7   When Ms. Counter and Mr. Kann tried to leave the area, the employee left
8   the Enterprise property and chased them down the street. (Decl. of
9   Counter, ¶ 29).

10       The lack of any van parking space serving the Enterprise created
11  frustration and difficulty for her. The harassment and refusal to cooperate
12  by all of the staff further caused Ms. Counter tremendous, unnecessary
13  stress and anxiety. (Decl. of Counter, ¶ 30).

14       The Enterprise is a convenient place for Ms. Counter to rent a
15  vehicle. When she needs to rent a vehicle in the future, the Enterprise
16  located at 1435 S. La Cienega, Los Angeles, would be the most convenient
17  location from which to do so.  (Decl. of Counter, ¶ 31).

18       On December 1, 2018, and December 3, 2018, Evens Louis, an
19  investigator for the plaintiff, conducted an investigation of the Enterprise.
20  (Decl. of Louis, ¶ 3). He found that the parking lot serving the Enterprise
21  offered approximately 19 parking spaces.  Out of the 19 parking spaces, 1
22  parking space was marked and reserved for persons with disabilities.
23  (Decl. of Louis, ¶ 4).  However, the parking space marked and reserved
24  for person with disabilities was used by cars that had no ADA placards or
25  license plates indicating that the parking space was in use by other persons
26  with disabilities. (Decl. of Louis, ¶ 5).

27       Ms. Counter would like the ability to safely and independently park
28  and access the Enterprise. (Decl. of Counter, ¶ 32).  Due to her experience

6

encountering the unlawful parking as well as the aggressive treatment she have received, she is and have been deterred from returning to Enterprise until the lawsuit is over and the Enterprise has been brought into compliance with the ADA Access Standards. (Decl. of Counter, ¶ 33). Additionally, Ms. Counter an active ADA litigator and she will return to assess compliance with the disability access laws and will face the same discriminatory barriers unless they are removed. (Decl. of Counter, ¶ 34).

### III. OBJECTIONS TO EXHIBITS

Plaintiff objects to Exhibit 1 of the Declaration of Deborah Manson to the extent it is offered as evidence the policy it describes is in fact adhered to. It is impermissible hearsay without exception in violation of Federal Rules of Evidence 801.

Plaintiff objects to paragraph 4 of the Declaration of Jason Perla to the extent it attempts to suggest what employees reported to Mr. Perla as impermissible hearsay without exception in violation of Federal Rules of Evidence 801. The substance of this paragraph has already been deemed inadmissible, and defendant has merely changed wording, not the implied content.

### IV. DEFENDANT'S JURISDICTIONAL CHALLENGE IS INAPPROPRIATE AS A 12(B)(1) MOTION

"There is an important difference between Rule 12(b)(1) motions attacking the complaint on its face and those that rely on extrinsic evidence. In ruling on the former, courts must accept the allegations of the complaint as true." *Kohler v. CJP, Ltd.*, 818 F. Supp. 2d 1169, 1172 (C.D. Cal. 2011).

Here, the defense has moved for dismissal on the basis that the court lacks subject matter jurisdiction. Dismissal for lack of subject matter

7

jurisdiction in a case premised on federal-question jurisdiction is "exceptional." *Sun Valley Gasoline, Inc. v. Ernst Enter., Inc.*, 711 F.2d 138, 140 (9th Cir. 1983).

The defense motion to dismiss for lack of jurisdiction is based entirely on the claim that the defendant's employees have now, since the initiation of the present litigation, been instructed to obey the law, avoid parking in the designated spots, and, therefore, there is nothing for the court to enjoin under the federal statute. While it is appropriate in certain circumstances to bring a motion under Federal Rule of Civil Procedure 12(b)(1) introducing extrinsic facts and challenging federal court jurisdiction, it is not appropriate in the present case with the present motion.

The problem with the defendant's motion is that the very question this Court needs to address in determining whether it has jurisdiction is the same question that must be answered to determine the merits of the case and whether plaintiff can prove his claims. Plaintiff alleges that the defendant's parking policy does not comply with state and federal accessibility laws. If that is true, the plaintiff wins and can obtain the injunction. If that is wrong, the plaintiff loses. That is the case. The ultimate question in this case is whether the defendant's parking policy complies with accessibility laws. The defendant, however, asks this Court to answer that very question in determining whether it has jurisdiction. This is improper.

The Ninth Circuit has cautioned that courts should not apply Federal Rule of Civil Procedure 12(b)(1) or 12(h)(3) when, as it is here, the issue of jurisdiction is intertwined with the merits of a claim. *See Sun Valley Gasoline*, 711 F.2d at 139-40; *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Robert v. Corrothers*, 812 F.2d 1173,

1177 (9th Cir. 1987) ("The relatively expansive standards of a 12(b)(1) motion are not appropriate for determining jurisdiction in a case . . . where issues of jurisdiction and substance are intertwined. A court may not resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'") (citation omitted); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("[I]f the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment and grant the motion to dismiss for lack of jurisdiction only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law . . . . Otherwise, the intertwined jurisdictional facts must be resolved at trial by the trier of fact."); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("A district court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, *if the jurisdictional facts are not intertwined with the merits*.").

Where the jurisdictional facts are intertwined with the merits, a Rule 56 "summary judgment standard" applies. *Roberts*, 812 F.2d at 1177; *Careau Grp. v. United Farm Workers of Am., AFL-CIO*, 940 F.2d 1291, 1293 (9th Cir. 1991). The question of jurisdiction and the merits of an action are considered intertwined where the same statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief. *Sun Valley*, 711 F.2d at 1138. The defense can and should bring its claims in the form of a Rule 56 motion.[1]

---

[1] Additionally, the Court could convert the motion to a summary judgment motion but given the fact that this case is at its earliest stage, discovery has not even begun, a

1    Simply put, this Court should not dismiss the action at this juncture
2    because the jurisdictional analysis is coextensive with the merits of
3    Plaintiff's ADA claim and a factual dispute exists as to the alleged
4    corrections.

5    **V. PLAINTIFF'S FIRST AMENDED COMPLAINT**
6    **ADEQUATELY PLEADS HER PRIMA FACIE CASE**

7
8    **A.    Counter is a profoundly disabled person and an active**
     **ADA litigator who personally encountered a blatant**
9    **parking policy violation at Enterprise Rent-A-Car and**
     **who has declared that she intends to return to the**
10   **Enterprise but is deterred from returning until it is**
     **fully compliant. There can be no doubt that Counter**
11   **has met the broad and liberal test for standing in ADA**
     **cases.**

12           Given the generous and broad standing requirement for ADA cases,
13   it is remarkable that the Enterprise Rent-A-Car is raising a standing
14   challenge in this case. Decades ago, the Supreme Court held that in civil
15   rights cases—especially where private enforcement suits are the primary
16   method of obtaining compliance—standing must be given a "generous
17   construction" and defined "as broadly as is permitted by Article III of the
18   Constitution."[2] The Ninth Circuit has expressly applied this holding to
19   ADA cases: "The Supreme Court has instructed us to take a broad view of
20   constitutional standing in civil rights cases, especially where, as under the
21   ADA, private enforcement suits are the primary method of obtaining
22   compliance with the Act."[3]

23

24   _____

25   summary judgment motion would be premature and unfair. Had plaintiff been given
     notice of a motion for summary judgment, he would be in a positon to file a Rule
26   56(d) request for continuance of denial, Indeed, Plaintiff has been actively
     preventing from conducting discovery into the very evidence offered in support of
27   this motion.

28   [2] *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 & 212 (1972).

     [3] *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 -1040 (9th Cir. 2008).

10

Opposition to Motion to Dismiss                    Case: 2:18-cv-10290-GW-AGR

Whenever ADA standing challenges have come before the courts, this has been a guiding principle. "Article III standing should likewise be construed as broadly as possible."[4] "[T]he ADA, the Unruh Act, and the DPA require the court to construe standing liberally . . . The ADA, the Unruh Act, and the DPA have granted private citizens a broad right to enforce their mandates."[5]

With respect to ADA-architectural-barrier cases, the Ninth Circuit has grappled with standing issues on numerous occasions and laid down a healthy body of published case law. The most significant of Ninth Circuit rulings on the topic is *Chapman v. Pier 1 Imports*,[6] which was decided by an *en banc* panel. *Chapman* holds that an ADA plaintiff: (1) "must demonstrate that he has suffered an injury-in-fact," and (to obtain injunctive relief), (2) demonstrate a "real and immediate threat of repeated injury" in the future.[7] Counter will discuss and apply each element to the facts of the present case.

**B.     Counter suffered an injury in fact because she personally encountered the unlawful parking policy condition at the Enterprise numerous times in 2018 and 2019.**

Under the ADA, the general rule is that persons with disabilities are entitled to "full and equal enjoyment" of facilities, privileges and accommodations offered by places of public accommodation.[8] A specific act of discrimination is the "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford

---

[4] *Wilson v. Pier 1 Imports (US), Inc.,* 413 F. Supp. 2d 1130, 1133 (E.D. Cal. 2006).

[5] *Natl. Fedn. of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1084 (N.D. Cal. 2015) (emphasis added).

[6] *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939 (9th Cir. 2011).

[7] *Chapman*, supra, 631 F.3d at 946.

[8] 42 U.S.C. § 12182(a).

goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the accommodation would work a fundamental alteration of those services and facilities."[9] The Chapman court held that a plaintiff's rights are violated under the ADA "when a disabled person encounters an accessibility barrier [that] interferes with the plaintiff's full and equal enjoyment of the facility."[10]

But what constitutes a barrier that interferes with full and equal enjoyment? *Chapman* answered this question definitively: "Because the ADAAG establishes the technical standards required for 'full and equal enjoyment,' if a barrier violating these standards relates to a plaintiff's disability, it will impair the plaintiff's full and equal access, which constitutes 'discrimination' under the ADA. That discrimination satisfies the 'injury-in-fact' element . . . ."[11] This is an objective test:

> A disabled person who encounters a "barrier," i.e., an architectural feature that fails to comply with an ADAAG standard relating to his disability, suffers unlawful discrimination as defined by the ADA. Indeed, by establishing a national standard for minimum levels of accessibility in all new facilities, the ADAAG removes the risk of vexatious litigation that a more subjective test would create. Those responsible for new construction are on notice that if they comply with the ADAAG's objectively measurable requirements, they will be free from suit by a person who has a particular disability related to that requirement.

[Chapman, supra, 631 F.3d at 948, fn. 5 (internal cites and quotes omitted for readability).]

In the present case, Ms. Counter has alleged in the First Amended Complaint she went to the Enterprise at least a dozen times during 2018 to rent vehicles. Ms. Counter has also alleged in her declaration that she

---

[9] 42 U.S.C. § 12182(b)(2)(A)(ii).

[10] *Chapman*, supra, 631 F.3d at 947.

[11] *Chapman*, supra, 631 F.3d at 947 (emphasis added).

12

went to the Enterprise again on March 13, 2019.  Ms. Counter attached to her Declarations the photographic evidence of her numerous visits to the Enterprise that she and Mr. Kann took. During her visits, she found that although defendants have parking spaces marked and reserved for persons with disabilities, the defendants park rental inventory in the parking spaces.   Two subsequent investigations revealed that the defendants indeed park rental inventory in these spaces on a regular and consistent basis. Photos of these investigations are also attached in the Declaration of investigator and concurrently submitted herewith.   During plaintiff's numerous visits in 2018, the defendants had absolutely no policy of prohibiting employees from using the parking spaces marked and reserved for persons with disabilities for rental inventory vehicles. There is no question that this was unlawful. Under the ADA Standards, any business that provides parking spaces must provide accessible parking spaces.[12] Here, even though Enterprise does have parking spaces marked and reserved for persons with disabilities, the defendants use the parking spaces to park Enterprise rental inventory in the spaces. A public accommodation must maintain in operable working condition those features of its facilities and equipment that are required to be readily accessible to and usable by persons with disabilities.[13]

Moreover, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."[14] A claimed remedy "might become moot if subsequent events make it absolutely clear that the

---

[12] 2010 Standards § 208.

[13] 28 C.F.R. § 36.211(a).

[14] City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).

Opposition to Motion to Dismiss                        Case: 2:18-cv-10290-GW-AGR

1    allegedly wrongful behavior could not reasonably be expected to recur."[15]
2    Even if the defense had identified a parking policy after it has been sued,
3    the plaintiff would be entitled to test and explore those claims in discovery.

4        Here, the failure to ensure that the accessible facilities were
5    available and ready to be used by the plaintiff is a violation of the law.
6    And there can be no question that this barrier "relates to" Counter's
7    disability. Counter is a wheelchair user and the requirement for accessible
8    parking affect wheelchair users. Thus, there can be no dispute that
9    Counter suffered an injury in fact during her numerous visits to the
10    Enterprise in 2018.

### C. Counter has standing to obtain injunctive relief because she is deterred from returning to the Enterprise Rent-A-Car until the unlawful barriers are removed.

14        The final question before the court in a standing inquiry is whether
15    a plaintiff can establish that there is ongoing injury or a real likelihood of
16    future injury.[16] It is axiomatic that if there is no ongoing or likely future
17    injury, then a plaintiff has no standing for injunctive relief. *Chapman*
18    firmly established that there are two ways to demonstrate such standing:
19    "Demonstrating an intent to return to a noncompliant accommodation is
20    but one way for an injured plaintiff to establish Article III standing to
21    pursue injunctive relief. A disabled individual also suffers a cognizable
22    injury if he is deterred from visiting a noncompliant public
23    accommodation because he has encountered barriers related to his
24    disability there."[17]

---

[15] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000).
[16] *Chapman*, supra, 631 F.3d at 946-47.
[17] *Chapman*, supra, 631 F.3d at 949.

Opposition to Motion to Dismiss        Case: 2:18-cv-10290-GW-AGR

In the present case, Counter has alleged such deterrence. Counter's deterrence allegations match the *Chapman* court's holding, almost word for word: "Plaintiff will return to Enterprise to avail herself of its goods or services once the barriers are permanently removed. In fact, Enterprise would be Plaintiff's first choice to rent a vehicle were the barriers removed. If the barriers are not removed, the plaintiff will face unlawful and discriminatory barriers again."[18]

Defendant attempts to suggest that because it could not find a reservation under Ms. Counter's name, she has no intention of returning. First, Defendant is well aware that the reservations were under the Ms. Counter's caregiver's name, Garry Michael Kann. More importantly, Ms. Counter need not ever have rented a vehicle from defendant's lot of have standing. While she has alleged she is in fact a bona fide customer, she could have gone to lot simply to see if Defendant was in compliance with the ADA. The Ninth Circuit recently tackled the issue head-on and ruled: "We also conclude that motivation is irrelevant to the question of standing under Title III of the ADA."[19] In *Civ. Rights*, the court held that "as a matter of first impression, a plaintiff suing under Title III of the ADA can claim tester standing."[20] In other words, it *does not matter why* Ms. Counter went to the business or desires to return, she has a right to full and equal access and to be free from discrimination.

It is uncontroverted that Ms. Counter visited the property, if for no other reason than to take pictures, and this is more than sufficient to meet the threshold for standing, especially given that courts have held that

---

[18] First Amended Complaint (Docket Entry 21), ¶ 39.

[19] *Civ. Rights Educ. and Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1102 (9th Cir. 2017).

[20] *Id.* at 1093.

standing should be construed generously, liberally and to the broadest extent possible in these ADA cases.

Stating an intention to return to a store after the barriers have been fixed is sufficient to establish standing: "When asked in his deposition whether he had any plans to return to the store, Doran answered, 'Yes, once it's fixed.' This deposition testimony demonstrates both Doran's continued deterrence from patronizing the store and his intention to return in the future once the barriers to his full and equal enjoyment of the goods and services offered there have been removed."[21]

The *Doran* court summarized, "Allegations that a plaintiff has visited a public accommodation on a prior occasion and is currently deterred from visiting that accommodation by accessibility barriers establish that a plaintiff's injury is actual or imminent."[22]

Similarly, in the very first case to establish deterrence-standing (a case coincidentally handled by plaintiff's counsel), the Ninth Circuit held, "We hold that a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.' Similarly, a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers 'imminent injury.'"[23]

And just last year, the Ninth Circuit weighed in again on the topic. In *Civ. Rights Educ.*,[24] several disabled plaintiffs sued a hotel chain for inaccessibility under the ADA. They did not have any concrete or specific

---

[21] *Doran*, supra, 524 F.3d at 1041.

[22] *Doran*, supra, 524 F.3d at 1041.

[23] *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002).

[24] *Civ. Rights Educ. and Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093 (9th Cir. 2017)

plans to return and the defendants argued that it was not enough to say that "they do not plan to stay at the hotels unless and until [defendant] remedies the violation."[25] But the Ninth Circuit rejected the defense argument: "The Named Plaintiffs need not intend to visit the hotels until after remediation" because "under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury [that] continues so long as equivalent access is denied."[26]

One of the out-of-circuit cases that the Ninth Circuit found persuasive in reaching its tester-standing decision was *Houston v. Marod*.[27] In *Houston*, the defense argued that plaintiff's "litigation history cast doubt on his sincerity to return to the Presidente Supermarket and face future discrimination. But the *Houston* court rejected the argument. Like the Ninth Circuit in *Civ. Rights Educ.*, the *Houston* court held that a plaintiff's rights to be free from architectural barrier discrimination does "not depend on the motive behind" the plaintiff's visit.[28] The *Houston* court held: "the tester motive behind [plaintiff's] *past and future* visits to the Presidente Supermarket does not preclude his having standing to sue for invasions of his legal rights."[29]

In the present case, even if Counter's sole motive for initially visiting the Enterprise and her sole motive for making a future visit is a tester motive, she still has standing. Counter stated plainly that her

---

[25] *Civ. Rights Educ.*, 867 F.3d at 1100.

[26] *Civ. Rights Educ.*, 867 F.3d at 1100-1101.

[27] *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013)

[28] *Houston,* supra, 733 F. 3d at 1332.

[29] *Houston,* supra, 733 F. 3d at 1332.(emphasis added)

primary motive for her first visit was "her desire to rent vehicles from Enterprise."[30]

She has also stated the same motives for returning: "Plaintiff will return to Enterprise to avail herself of its goods or services once the barriers are permanently removed. In fact, Enterprise would be Plaintiff's first choice to rent a vehicle were the barriers removed. If the barriers are not removed, the plaintiff will face unlawful and discriminatory barriers again."[31]

## VI.  THE DEFENSE HAS NOT MET THE "FORMIDABLE" BURDEN OF ESTABLISHING MOOTNESS

In order to establish that the federal claim has been rendered moot, the defense must establish that the violation cannot be reasonably expected to recur.

"The test for mootness…is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203-04 (1968) (citation and internal punctuation omitted). Moreover, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). A claimed remedy "might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 167. The party asserting mootness has "the heavy burden of

---

[30] First Amended Complaint (Docket Entry 21), ¶ 13.
[31] First Amended Complaint (Docket Entry 21), ¶ 39.

Opposition to Motion to Dismiss                    Case: 2:18-cv-10290-GW-AGR

persuading the Court that the challenged conduct cannot be reasonably expected to recur." *Id.* One court, presiding over an ADA case, summarized the standard as follows:

> The burden of establishing mootness by voluntary compliance is a heavy one. A request for prospective relief can be mooted by a defendant's voluntary compliance if the defendant meets the "formidable burden" of demonstrating that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Such a burden will typically be met only by changes that are permanent in nature and that foreclose a reasonable chance of recurrence of the challenged conduct.

*Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) (internal cites and quotes omitted for readability).

There are a number of ADA violations that are structural in nature and their removal means that the violation cannot reasonably recur. For example, if the barrier is an unramped step and the defendant physically removes the step and replaces it with a permanent ramp, there is no reasonable likelihood that the violation will be repeated. When the removal of the barrier involves a "structural modification," it is unlikely that the barrier will show up again in the future. *Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 99 (D.D.C. 2007) (where the defendant installed a handicap accessible sink and the court noted that the lack of an accessible sink could not be reasonably expected to recur in the future as the fix involved "structural modification" that was, "in short, a *fixture*" and somewhat permanent) (emphasis in original).[32]

---

[32] There is no question that the defense has a significant burden with respect to establishing mootness. See, e.g., *Kalani v. Castle Village LLC*, 14 F.Supp.3d 1359, fn. 44 (E.D. Cal. 2014) (where the defense corrected access problems but the Court refused to dismiss the request for an injunction because, "However, the claim for injunctive relief relating to those facilities is not dismissed, because it is not established that those facilities will never revert to non-accessible public accommodations, however unlikely that seems."

1    We do not have a similar situation in the present case. Defendant
2    has merely and at long last told its employees they really ought to follow
3    federal civil rights law, with no apparent repercussions for those who fail
4    to do so. And this was done not "proactively," as they claim, but only after
5    being sued for violating the ADA. Under such circumstances, courts have
6    been advised to be skeptical. "It is the duty of the courts to beware of
7    efforts to defeat injunctive relief by protestations of repentance and
8    reform, especially when abandonment seems timed to anticipate suit, and
9    there is a probability of resumption." *Santiago v. Miles*, 774 F.Supp. 775,
10   793 (W.D.N.Y. 1991), *quoting*, *United States v. W.T. Grant,* 345 U.S. 629,
11   632 (1953) "[S]uch actions in the face of litigation are equivocal in
12   purpose, motive, and permanence." *Jenkins*, 400 F.2d AT 33; *see also*
13   *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1186 (11th Cir.
14   2007) (collecting cases); *Steel Co. v. Citizens for a Better Env't,* 523 U.S.
15   83, 109 (1998) ("presumption" of future injury when cessation occurs in
16   response to suit); *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 71-72
17   (1983); *Nat'l Adver. Co. v. City of Miami,* 402 F.3d 1329, 1333 (11th
18   Cir.2005) (per curiam) ("[V]oluntary cessation of offensive conduct will
19   only moot litigation if it is clear that the defendant has not changed course
20   simply to deprive the court of jurisdiction."); *Houston v. 7-Eleven, Inc.*,
21   2014 WL 5488805, at *12 (M.D. Fla. 2014) ("The heavy burden of
22   persuading the Court that the challenged conduct cannot reasonably be
23   expected to start up again lies with the party asserting mootness. The Court
24   recognizes that Defendant has expended substantial efforts to bring the
25   stores into compliance; however, the allegations of a pattern and practice
26   of noncompliance cloud the issue.")
27   Merely fixing a problem after being sued does not render the claims
28   moot. "The question is not whether the precise relief sought at the time

20

1   the application for an injunction was filed is still available. The question
2   is whether there can by any effective relief. Mere voluntary cessation of
3   allegedly illegal conduct does not moot a case; it if did, the courts would
4   be compelled to leave the defendant free to return to his old ways." *Grove*
5   *v. De La Cruz*, 407 F. Supp. 2d 1126, 1130 (C.D. Cal. 2005) (internal cites
6   and quotes omitted for readability). Here, if the Court finds that there was
7   a parking policy violation, the Court can certainly order the defendant to
8   maintain the parking policy in compliance with the ADA accessibility
9   standards.   An example of a case where these standards were applied in
10  an ADA setting is *Feldman v. Pro Football, Inc*., 419 F. App'x 381 (4th
11  Cir. 2011). In *Feldman*, the plaintiffs were three deaf persons who
12  regularly attended Redskins games at FedEx Field. Id. at 383. They filed
13  suit under the ADA because the defendants failed to provide auxiliary
14  access to the content of the broadcasts from FedEx Field's public address
15  system. *Id.* Soon after plaintiffs filed their complaint, defendants
16  captioned most of the aural content. *Id.*  Among other steps taken, the
17  defense captioned the field's two light-emitting diode ribbon boards and
18  most of the televisions in the concourse area and they hired a stenographer
19  to provide the captioning. *Id.* at 385. The district court denied the defense
20  motion for summary judgment and on the mootness claim, held: "Given
21  the ease with which defendants could stop providing captioning, we
22  simply cannot say that they have made an affirmative showing that the
23  continuation of their alleged ADA violations is 'nearly impossible.'" *Id*.
24  at 387.

25      In this case, at literally any moment the practice of blocking the
26  designated spots with rental cars could resume. Indeed, given the company
27  culture Ms. Counter witnessed on her visits, it seems incredibly likely
28  without the prospect of repercussions, this facility will be in violation

again shortly. Even after the brand new policy was following federal law was put in place, Ms. Counter witnessed a rental vehicle parked in a designated spot. Defendants claim it was rented by an individual with a placard, but have refused to participate in discovery to allow Plaintiff to test that claim.

## VII. THERE IS NO BASIS FOR THE COURT TO DECLINE SUPPLEMENTAL JURISDICTION OVER THE UNRUH CLAIM

Under 28 U.S.C. § 1367 ("section 1367"), where a district court has original jurisdiction over a claim, it also has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A state claim is part of the same "case or controversy" as a federal claim when the two "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 855-56 (9th Cir. 2004), *quoting United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). In addition, "economy, convenience, fairness and comity" should be considered in an analysis of supplemental jurisdiction. *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 173 (1997).

The exercise of supplemental jurisdiction is mandatory, unless the exercise of jurisdiction is prohibited by section 1367(b) or falls under one of the exceptions set forth in section 1367(c). *Executive Software N. Am., Inc. v. U.S. Dist. Court for the N. Dist. of Cal.*, 24 F.3d 1545, 1555-56 (9th Cir. 1994). Under section 1367(c), a court may decline to exercise supplemental jurisdiction over a related state claim only if: "(1) the claim

raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *Id.*, citing 28 U.S.C. § 1367(c).

Here, Defense has no legal basis in its argument that the Court should not exercise supplemental jurisdiction over the state law claims except for its hazy speculation that the Court will dismiss Plaintiff's federal claims. No other basis is mentioned and even this basis is not fleshed out. The ADA and Unruh are inextricably intertwined. A violation of the ADA is a per se violation of Unruh. Cal. Civ. Code § 51(f). The incident that forms the basis of both claims is identical. The witnesses are identical. All the documentary evidence (photographs, measurements, bank records, policies, etc.) are identical. All the case law, regulatory material, regulations, and accessibility standards necessary to demonstrate liability under both claims in this case are identical. Counter's counsel is not aware of a federal and state claim more intertwined than the ADA/Unruh pair.

Here, if this Court were to decline to exercise supplemental jurisdiction over the state claim, it would result in Plaintiff pursuing the Unruh claim in state court while. Given that Counter's state claim is predicated upon a finding that the ADA has been violated, this means that identical cases would be subsequently prosecuted in two different forums. Plaintiff struggles to see how this benefits either her or the movant.

As one Court presiding over a similar case recently noted, "Forcing these parties to litigate two nearly-identical cases in separate venues—one here and one in state court—is neither convenient, economical, nor fair."

---

Opposition to Motion to Dismiss                    Case: 2:18-cv-10290-GW-AGR

*Baker v. Palo Alto University, Inc.*, 2014 WL 631452, *2 (N.D. Cal., 2014). Likewise, the *Delgado* Court reasoned:

> Here, the claims arise from a common nucleus of operative facts. Both the federal and state law claims are based upon architectural barriers which infringe upon the accessibility to the OSH Store. Accordingly, this Court has supplemental jurisdiction over the state law claims. The Court will exercise supplemental jurisdiction over the state law claims. Here, the state issues are not unsettled or novel and complex. Plaintiff's state and federal law claim involve the identical nucleus of operative facts, and require a very similar, if not identical, showing in order to succeed. If this court forced plaintiff to pursue his state law claims in state court, the result would be two highly duplicative trials, constituting an unnecessary expenditure of plaintiff's, defendant's, and the two courts' resources. As a practical matter, plaintiff's state law claims for damages may be the driving force behind this action. To rule as OSH proposes, however, would effectively preclude a district court from ever asserting supplemental jurisdiction over a state law claim under the Unruh Act.
>
> [*Delgado v. Orchard Supply Hardware Corp.*, 826 F. Supp. 2d 1208, 1221 (E.D. Cal. 2011).]

When the federal claims are dismissed from the case, the District Court has discretion whether to maintain its supplemental jurisdiction over the state claims or dismiss them. *Schneider v. TRW, Inc.*, 938 F.2d 986, 993 (9th Cir. 1991). The "justification" underlying the decision whether to maintain supplemental jurisdiction or dismiss a case "lies in considerations of judicial economy, convenience and **fairness to litigants**..." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) (emphasis added). In fact, the Courts have recognized that judicial economy is the "essential policy behind the modern doctrine of pendent jurisdiction" and it supports "the retention of pendent jurisdiction in any case where substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Id.*, citing *Rosado v. Wyman*, 397 U.S. 397, 405 (1970).

1   The *Kohler* case presents a lengthy analysis of the issue and
2   concluded that fairness favored keeping the Unruh claim in federal court
3   "rather than in a separate, and largely redundant, state-court suit." *Kohler*
4   *v. Rednap*, *Inc.*, 794 F. Supp. 2d 1091, 1096 (C.D. Cal. 2011). Another
5   court held that supplemental jurisdiction should be exercised where
6   "declining jurisdiction would simply require twice the expenditure of
7   resources as to the evidentiary determinations." *Daenzer v. Wayland Ford,*
8   *Inc.*, 193 F. Supp. 2d 1030, 1043 (W.D. Mich. 2002).  Another framing of
9   the analysis states that supplemental jurisdiction should be exercised to
10  avoid "two parallel proceedings, one in federal court and one in the state
11  system." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 787 (3d Cir.
12  1995). Here, the federal claim has not been lost and the principles of
13  judicial economy and fairness militates toward keeping Unruh.

## VIII. CONCLUSION

16      Counter respectfully requests this Court deny the defense motion
17  and permit this case to proceed past the pleadings stage. The Plaintiff has
18  standing and there is no basis for the court to decline supplemental
19  jurisdiction over the Unruh claim.

21  Dated: June 6, 2019                    CENTER FOR DISABILITY ACCESS

24                          By:_____/s/ Chris Carson_____
25                              CHRIS CARSON
                                Attorneys for Plaintiff